Eric Clarke, County Attorney, UT Bar No. 13177
Devin Snow, Lead Civil Attorney, UT Bar No. 14330
Washington County Attorney's Office
33 North 100 West
St. George, Utah 84770
Telephone:  435.301.7100
Eric.Clarke@wcattorney.com
Devin.Snow@wcattorney.com

Paul S. Weiland, CA Bar No. 237058
*(Pro Hac Vice Application Pending)*
David J. Miller, CA Bar No. 274936
*(Pro Hac Vice Application Pending)*
Nossaman LLP
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
pweiland@nossaman.com
dmiller@nossaman.com

Attorneys for Plaintiff Washington County, Utah

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WASHINGTON COUNTY, UTAH, | **COMPLAINT** |
| Plaintiff, | Case No. 4:24-cv-00067-DN |
| vs. | |
| U.S. DEPARTMENT OF THE INTERIOR; BUREAU OF LAND MANAGEMENT; U.S. FISH AND WILDLIFE SERVICE; and DOES 1 through 10, inclusive, | District Judge David Nuffer |
| Defendants. | |

1

## INTRODUCTION

1.   Congress passed and President Obama signed into law the Omnibus Public Land Management Act ("OPLMA"), Public Law 111–11, in 2009. Section 1977(b) of OPLMA required the Secretary of the Interior to develop a transportation management plan for land managed by the Bureau of Land Management ("BLM") in Washington County ("County") within three years of the date of enactment of the Act and specified that the plan shall "identify 1 or more alternatives for a northern transportation route in the County." The need for the northern transportation route to accommodate growth in the County was contemplated in local transportation plans for many years preceding the passage of OPLMA. And, even after OPLMA was passed into law, for a number of years the obligation went unmet. But in 2018 the State of Utah applied for a right-of-way ("ROW") to construct the Northern Corridor. After an extensive permitting process, BLM issued a Final Environmental Impact Statement and Record of Decision under the National Environmental Policy Act and granted the ROW under the Federal Land Management and Policy Act, and the Fish and Wildlife Service ("Service") issued a biological opinion under the Endangered Species Act ("ESA") for the Northern Corridor. In a related action, the Service imposed on the County a number of obligations designed specifically to offset the impacts of the construction of the Northern Corridor on other conservations efforts. These obligations were included in a "changed circumstances" provision in the County's Amended and Restated Habitat Conservation Plan ("HCP") and related renewed and amended incidental take permit ("Renewed ITP").

2.   Special interest groups challenged the Northern Corridor approvals, and the Department of the Interior ("Interior") has since sought to unwind the approvals by circumventing its own requirements. Inexplicably, Interior has sought to continue to impose on the County the offset obligations for the effects of the Northern Corridor, even as the agency endeavored to eliminate the project.

3.   This lawsuit seeks declaratory and injunctive relief against Interior and the Service related to violations of section 10 of the ESA and violations of the Service's "No Surprises" Rule in connection with the Service's unlawful withdrawal of the biological opinion for the BLM grant of right-of-way for the Northern Corridor Highway Project. Specifically, the Service violated ESA section 10 and the No Surprises Policy with its determination that the County must continue to comply with the conservation commitments for the Northern Corridor changed circumstance despite the prerequisites for that changed circumstance no longer existing due to the Service's withdrawal of the Northern Corridor biological opinion ("BiOp").

4.   This lawsuit also challenges the Service's and the BLM's improper reinitiation of consultation and withdrawal of the Northern Corridor BiOp under section 7 of the Endangered Species Act ("ESA") because reinitiation was not based on any of the triggers for reinitiation specified in the regulations and the Northern Corridor BiOp.

5.   The County seeks declaratory and injunctive relief requiring the Service to reverse its determination that the County must comply with the Northern Corridor changed circumstance and enjoining the Service from enforcing the Northern Corridor changed circumstance conservation measures where no Northern Corridor BiOp is issued. The County further seeks declaratory and injunctive relief requiring the Service to reverse its withdrawal of the Northern Corridor BiOp.

## LEGAL FRAMEWORK

### The Endangered Species Act

6.   Congress enacted the ESA to advance the "overall goal of species preservation," and, at the same time, "avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett v. Spear*, 520 U.S. 154, 176-177 (1997).

7.   The ESA provides protection for endangered and threatened species and their habitats, including the Mojave desert tortoise. 16 U.S.C.  §§ 1536 and 1538.

8.   Section 7(a)(2) of the ESA requires federal agencies (the "action agency") to consult with the Service to ensure that any action "authorized, funded, or carried out" by such agency is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical habitat]." 16 U.S.C. § 1536(a)(2).

9.   The Joint Consultation regulations developed by FWS and National Marine Fisheries Service ("NMFS") to implement section 7(a)(2) of the ESA specify that an agency's duty to consult is triggered whenever it is determined that an agency's action "may affect" a threatened or endangered species or its critical habitat.  50 C.F.R. § 402.14.

10. The formal consultation process is initiated when the action agency sends a written request to FWS.  As part of the formal consultation, FWS prepares a biological opinion to determine whether the action is likely to jeopardize the continued existence of a listed species. 50 C.F.R. § 402.14(g)(4), (h)(3).

11. In developing a biological opinion, FWS is obligated to consider the effects of the proposed action together with the environmental baseline when determining whether the action is likely to jeopardize one or more listed species or destroy or adversely modify designated critical habitat of such species.  16 U.S.C. § 1536; 50 C.F.R. § 402.02.

12. If FWS finds no jeopardy or adverse modification but determines that the action will result in an incidental take of a protected species, FWS can authorize the take through an incidental take statement or permit. 16 U.S.C. § 1539(A)(1)(b).

13. The issuance of a biological opinion is the formal completion of the consultation process required by Section 7 of the ESA.  50 C.F.R. § 402.02. The Service and NMFS have promulgated a single regulation that specifies four circumstances in which reinitiation of

consultation is required ("Reinitiation Triggers"): (1) Amount or extent of incidental take is exceeded; (2) New information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) Action is modified in a manner causing effects to listed species or critical habitat that were not previously considered; and (4) New species is listed or critical habitat designated that may be affected by the action. 50 C.F.R. § 402.16.

14. Section 10 of the ESA authorizes states, local governments, and private landowners to apply for an Incidental Take Permit for otherwise lawful activities that may harm listed species or their habitats. To qualify for the incidental take permit, an applicant must submit a habitat conservation plan ("HCP") to FWS specifying: (1) the impact which will likely result from the taking; (2) what steps the applicant will take to minimize and mitigate such impacts to the extent practicable and the funding that will be available to implement those steps; (3) what alternatives to the taking the applicant considered and the reasons why the applicant is not employing those alternatives; and (4) other measures that FWS may deem necessary or appropriate for the plan. Id. § 1539(a)(2)(A).

15. If FWS determines that the taking of the species will be incidental to the agency action, FWS shall provide the applicant with a written statement: (1) specifying the amount or extent of the incidental taking on the species; (2) identifying reasonable and prudent measures that FWS deems necessary or appropriate to minimize the impact; and (3) adopting terms and conditions that the federal agency or applicant, if any, or both, must comply with to implement the reasonable and prudent measures enumerated by FWS. Id. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1).

16. To address the problem of maintaining regulatory assurances and providing regulatory certainty in exchange for conservation commitments, the Services jointly established a ''No Surprises'' policy for HCPs on August 11, 1994. The No Surprises policy sets forth a clear

5

commitment by the Service that, to the extent consistent with the requirements of the ESA and other Federal laws, the government will honor its agreements under a negotiated and approved HCP for which the permittee is in good faith implementing the HCP's terms and conditions. The specific nature of these provisions will vary among HCPs depending upon individual habitat and species needs. The No Surprises policy and subsequently promulgated No Surprises Rule provide certainty for non-Federal property owners in ESA HCP planning areas.

17. The Service's No Surprises Rule defines "changed circumstances" as "changes in circumstances affecting a species or geographic area covered by a conservation plan or agreement that can reasonably be anticipated by plan or agreement developers and the Service and that can be planned for (e.g., the listing of new species, or a fire or other natural catastrophic event in areas prone to such events)." 50 C.F.R. § 17.3. The No Surprises Rule, then, provides that "[i]f additional conservation measures are deemed necessary to respond to changed circumstances and were provided for in the plan's operating conservation program, the permittee will implement the measures specified in the plan." 50 C.F.R. § 17.32(b)(5)(i). If, however, additional conservation measures are deemed necessary to respond to changed circumstances and such measures were not provided for in the plan's operating conservation program, the Service "will not require any conservation measures in addition to those provided for in the plan without the consent of the permittee, provided the plan is being properly implemented." 50 C.F.R. § 17.32(b)(5)(ii).

## **FACTUAL BACKGROUND**

### **The 1995 Habitat Conservation Plan and Incidental Take Permit**

18. In 1995, the County prepared an HCP that provided for conservation of the Upper Virgin River recovery unit ("UVRRU") of the Mojave desert tortoise (*Gopherus agassizii*). The Mojave desert tortoise is broadly distributed across arid lands in the American Southwest including portions of Arizona, California, Nevada, and Utah. The species is listed by the Service

62849362

as threatened under the ESA. The plan area for the County's 1995 HCP was the limits of Washington County.

19. The 1995 HCP's conservation program was designed to achieve within the County recommendations of the 1994 Desert Tortoise (Mojave Population) Recovery Plan. The County's commitments in the 1995 HCP significantly aided the broader, multi-agency goal of creation of the 61,022-acre Red Cliffs Desert Reserve ("Reserve"). Creating the Reserve involved actions by the County and its HCP partners to define the Reserve boundary, consolidate approximately 18,609 acres of private or public school trust lands within the Reserve boundary into federal or state ownership, and establish certain land use restrictions protecting the Mojave desert tortoise within the Reserve.

20. Other conservation measures occurring either under or collateral to the 1995 HCP included actions to: (1) manage the Reserve for the benefit of the Mojave desert tortoise, such as removing grazing, installing fencing, and eliminating several motorized routes; (2) perform monitoring and research activities; (3) provide education to the public; (4) implement protocols for performing certain types of land use activities inside and outside of the Reserve; and (5) collect and translocate Mojave desert tortoise from areas subject to land development and other human activities to under-occupied portions of the Reserve.

21. The County's commitments in the 1995 HCP supported the issuance of an Incidental Take Permit (permit number TE036719, the "Original ITP") by the Service to the County on March 15, 1996.

22. The Original ITP authorized the incidental take of Mojave desert tortoise associated with the Covered Activities under the HCP that included otherwise lawful land use and land development activities across approximately 350,000 acres of non-federal lands outside the Reserve and a specific, limited set of activities that could occur within the Reserve.

62849362

23. The 1995 HCP established special administrative procedures for performing Covered Activities in delineated incidental take areas where Mojave desert tortoise habitat was either known to be occupied or was deemed potentially occupied, including but not limited to advance notification (with desert tortoise surveys and translocation prior to development) and requiring the HCP Administrator to track the acres that were released for Covered Activities.

### The Amended HCP and Renewed Incidental Take Permit

24. The Original ITP had a term of 20 years and an expiration date of March 14, 2016. Prior to the expiration of the Original ITP, the County applied to the Service for renewal of the ITP. The County neither sought to expand the list of Covered Activities nor to alter the amount of incidental take being authorized.

25. In October 2020, after extensive, collaborative work with the Service, the County submitted the Amended and Restated HCP ("Amended HCP") to the Service for renewal and amendment of the Original ITP.

26. With the Amended HCP, the County amended and restated the 1995 HCP and sought a renewed and amended ITP ("Renewed ITP") with an additional 25-year term. The Amended HCP made certain changes to facilitate continued implementation of the recovery-focused HCP for the Renewed ITP term.

27. While the Amended HCP reorganized, clarified, and updated the content of the 1995 HCP, the overall intent and basic framework of the 1995 HCP was preserved.

28. Consistent with the Service's regulations governing issuance of permits for incidental take, 50 C.F.R. §§ 17.22(b)(5), 17.32(b)(5), the Amended HCP describes "changed circumstances" (as defined in 50 C.F.R. § 17.3) that may occur during the term of the Renewed ITP and measures the County will take in response to those changed circumstances. The Amended HCP explains the "no surprises" assurances the Service provides to the County with respect to unforeseen circumstances.

62849362

29. The changed circumstances include the potential for the BLM to grant the Utah Department of Transportation ("UDOT") the ROW for the Northern Corridor highway project ("Project") and for UDOT to construct the Project. Notably, the Amended HCP does not, under any circumstances, provide incidental take coverage for the Northern Corridor Project. Take related to the Northern Corridor Project is covered by the Northern Corridor biological opinion ("Northern Corridor BiOp") and its included Incidental Take Statement issued by the Service to BLM.

30. Under the Amended HCP's changed circumstance that BLM approves the ROW for the Northern Corridor, the County would take other steps to ensure that the overall conservation program contemplated in the Amended HCP could be achieved. The triggers for the Northern Corridor changed circumstance are issuance of the ROW by the BLM to UDOT and issuance of the Northern Corridor BiOp by the Service.

31. In January 2021, the Service issued the Renewed ITP to the County and approved implementation of the Amended HCP. The County is the Renewed ITP permittee. The County is responsible for administering the Amended HCP. The County is also responsible for complying with the terms and conditions of the Renewed ITP.

32. The County and its HCP partners have made substantial progress toward fully implementing the goals and objectives of the 1995 HCP. In several instances, the County and its HCP Partners have exceeded their respective obligations under the 1995 HCP. The collaborative effort of the County and its HCP partners has provided for the establishment, management, and monitoring of the Reserve since approval of the 1995 HCP.

33. The County, as the ITP permittee, committed in the 1995 HCP to implement a variety of conservation measures inside and outside of the Reserve. These financial commitments have been met in full, resulting in the release of all authorized take for use for the Covered Activities. Implementation of the conservation measures specified in the 1995 HCP have outpaced

9

incidental takings of the Mojave desert tortoise by Covered Activities. The County spent 170% of its required financial commitments toward implementing the 1995 HCP. More than 60% of Reserve acquisitions have been completed. In contrast, only 26% of the originally authorized take has been used through 2019.

34. The purpose of the Amended HCP and Renewed ITP was extension of the County's access to previously authorized, but unused, incidental take of the Mojave desert tortoise for an extended term of 25 years. The activities addressed by the Amended HCP and Renewed ITP include otherwise lawful, nonfederal uses or land development activities occurring within Washington County associated with the Upper Virgin River population of the Mojave desert tortoise.

35. The County has made millions of dollars of commitments in reliance on the Amended HCP and Renewed ITP. The County and other parties have moved ahead with activities permitted by these approvals.

36. In reliance upon the Federal agency determinations and authorizations, including the issuance of the Northern Corridor BiOp, the County expanded the Red Cliffs Desert Reserve by adding a new 6,812-acre area supporting high tortoise densities (Zone 6). Approximately half of Zone 6 lands are state or privately owned, with the other half managed by the BLM.

37. In reliance upon the Federal agency determinations and authorizations, the County acquired 450 acres of land in Zone 6 of the Reserve for the benefit of Mojave desert tortoise. Acquisition of these 450 acres cost $3.78 million in 2021 alone.

38. Also in reliance on the Federal agency determinations and authorizations, the County hired four full-time law enforcement personnel to enforce access and use regulations within the Reserve. Moreover, as a result of the Northern Corridor changed circumstance, the amount of authorized take the County had otherwise met its obligations for was reduced below the Original ITP level.

62849362

## The Northern Corridor ROW

39. In 2018, the State applied to BLM for a ROW to construct the Northern Corridor. Congress established the Red Cliffs National Conservation Area ("NCA"). In the authorizing legislation for the NCA, Congress expressly instructed the Secretary of the Interior to develop a travel management plan that identifies a "northern transportation route" in Washington County in 2009. Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, §§ 1974, 1977, 123 Stat. 991, 1081-1083, 1088-1091 (Mar. 30, 2009).

40. In response to the ROW application, after extensive environmental review, the Secretary of the Interior approved the issuance of the ROW grant to the State for the Northern Corridor.

41. The Northern Corridor will connect Washington Parkway in Washington City to Red Hills Parkway in St. George. The Service issued a biological opinion that authorizes incidental take associated with the Northern Corridor Project (i.e., the Northern Corridor BiOp).

42. The County's Amended HCP prescribes a County response to the Northern Corridor changed circumstance. Specifically, the Service's issuance of a biological opinion for and the BLM's approval of the Northern Corridor ROW triggered the County's obligation to establish, administer, and manage the designation of a new Reserve Zone 6 to achieve the purposes of the conservation program described in the Amended HCP. Zone 6 would be managed as part of the Reserve for the conservation of desert tortoise. It also triggered a number of conservation measures designed to ensure that the overall conservation program contemplated in the Amended HCP could be achieved.

## The Settlement Agreement and Withdrawal of the Northern Corridor BiOp

43. Through federal permitting and consultation processes, the Service issued two biological opinions – one regarding the Amended HCP and one regarding UDOT's Northern Corridor Project. Each biological opinion includes an incidental take statement ("ITS").

11

44. The Service also issued the Renewed ITP. The Renewed ITP authorizes incidental take of the Mojave desert tortoise under the Amended HCP.

45. Based on the Service's approvals and authorizations, special interest groups issued a notice of intent ("NOI") to sue the Service over the biological opinions, ITSs, and Renewed ITP. On July 27, 2021, those groups filed a First Amended Complaint for Declaratory and Injunctive Relief ("Amended Complaint") in the District Court for the District of Columbia.

46. The County intervened in the litigation to protect its rights under the Amended HCP and Renewed ITP, as well as to defend the ROW grant to UDOT for the Northern Corridor.

47. On May 22, 2023, Federal Defendants filed a Motion for Voluntary Remand with Partial Vacatur (the "Remand Motion"). The Remand Motion sought: (1) voluntary remand and vacatur of the Northern Corridor ROW decision and grant; (2) voluntary remand of the amendments to the Red Cliffs National Conservation Area Resource Management Plan ("RMP") and the St. George Field Office RMP for further consideration; and (3) voluntary remand of the Renewed ITP and the associated biological opinion. The County and UDOT opposed the Remand Motion.

48. On August 30, 2023, the plaintiffs and the Service and BLM entered into a settlement agreement requiring Federal Defendants to take several actions relating to supplemental environmental review for the Northern Corridor ROW (the "Settlement Agreement"). One such action was seeking partial vacatur of the Federal approvals for the Northern Corridor Project.

49. Neither the County nor UDOT were permitted by Plaintiffs or Federal Defendants to participate in any aspect of the settlement discussions. The County acquired the Settlement Agreement through a Freedom of Information Act request.

50. Section 3.c of the Settlement Agreement requires that, within 60 days of a court order remanding the Northern Corridor ROW, the BLM must request withdrawal of the Northern

Corridor BiOp. It further requires that the Service withdraw the Northern Corridor BiOp within 60 days of receipt of the BLM's request.

51. On November 16, 2023, the court issued an order granting in part and denying in part Federal Defendants' Motion for Voluntary Remand ("Remand Order"). The Remand Order remanded the January 13, 2021 grant of the Northern Corridor ROW and associated Record of Decision to the BLM for reconsideration. The Remand Order also remanded the Renewed ITP and associated Record of Decision to the Service for reconsideration. The Court declined to vacate any of the approvals for either the Northern Corridor or the Amended HCP.

52. On January 4, 2024, Gregory Sheehan, State Director for BLM in the State of Utah, requested the Service withdraw the Northern Corridor BiOp ("Request to Withdraw"). The stated reason for this withdrawal request was Section 3.c of the "out-of-court settlement agreement" among the Service, BLM, and Plaintiffs.

53. On March 8, 2024, the Service issued the Amended BiOp. The Amended BiOp "withdr[ew] the portions of the original BO related to the Northern Corridor Highway ROW." The Amended BiOp addresses only the BLM's "amended Resource Management Plans (RMPs) for the St. George Field Office and Red Cliffs National Conservation Area (NCA)." The Amended BiOp "only considers the amendments to the Red Cliffs NCA RMP and St. George Field Office RMP for effects to the Mojave desert tortoise and desert tortoise designated critical habitat." The Amended BiOp states that "[s]ubsequent issuance of a ROW for the Northern Corridor "would require additional section 7 consultation . . . ."

54. Withdrawal of the Northern Corridor BiOp removed one of the two required triggers for the Northern Corridor changed circumstance. Despite removal of this required trigger, the Service has indicated that the County remains obligated to carry out the responsive actions described in the Amended HCP's Northern Corridor changed circumstance.

55. Based on the Service's instruction, the County has continued to carry out its obligations pursuant to the Amended HCP's Northern Corridor changed circumstance.

56. On June 4, 2024, the County served on Defendants a notice of intent to sue under Section 11 of the ESA, identifying the Service's and BLM's violations of Section 10 of the ESA, the No Surprises Policy and Rule, and the ESA's regulations governing reinitiation of consultation.

57. On June 28, 2024, the Service sent the County a response to the notice letter, which failed to address or examine the claims in the notice letter.

<u>**JURISDICTION AND VENUE**</u>

58. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 5 U.S.C. § 703 (actions arising under the Administrative Procedure Act ("APA")); and/or 16 U.S.C. § 1540(c) (actions arising under the ESA).

59. Plaintiff brings this suit pursuant to section 11(g) of the ESA, 16 U.S.C. § 1540(g), and section 702 of the APA, 5 U.S.C. § 702.

60. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201. As such, this Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

61. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) (suit may be brought in the district where a substantial part of the activities that are the subject of the action are situated).

<u>**PARTIES**</u>

62. Plaintiff Washington County is a county in the southwestern corner of Utah. The County is the permit holder of the Renewed ITP. The County, along with its partners, is responsible for administering the Amended HCP, including all required conservation measures.

63. The County, as the permit holder of the Renewed ITP, has committed to perform certain actions under the Amended HCP in response to Federal approval of the ROW for the

14

Northern Corridor and issuance of the Northern Corridor BiOp. The Northern Corridor BiOp acknowledged that the Amended HCP included HCP partner commitments and conservation measures associated with the grant of the Northern Corridor ROW as a changed circumstance. The Service withdrew one of the triggers for the Northern Corridor ROW changed circumstance: the Northern Corridor BiOp.

64. The County made commitments in response to the Northern Corridor ROW changed circumstance. Those commitments are an effect of the action considered in the Amended HCP BiOp and the Renewed ITP. They include a reduction in the amount of previously authorized take in the Amended HCP, land acquisition within the newly created Reserve Zone 6, funding an implementation of certain management actions within Zone 6, additional funding for administration for the Amended HCP and for adaptive management and monitoring activities across the entire Reserve, and funding for the addition of Mojave desert tortoise passages beneath Cottonwood Road within Reserve Zone 3. These commitments were estimated to cost approximately $16 million dollars over the life of the ITP. Approximately $5 million has already been spent by the County toward these commitments.

65. Since 1995, the County has worked to ensure implementation of the conservation measures under both the 1995 and Amended HCPs. That includes taking substantial steps to implement its commitments pursuant to the Northern Corridor changed circumstance, which is only triggered by the issuance of the Northern Corridor BiOp. Withdrawal of the Northern Corridor BiOp and the Service's insistence in the County's continued compliance with its commitments under the Northern Corridor changed circumstance has resulted in greater burdens on the County and its state partners without any indication that the Northern Corridor will be constructed.

62849362

66. Defendant United States Department of the Interior is a federal agency and a department of the United States Government, established by statute and charged with administering federal programs under the ESA.

67. Defendant United States Fish and Wildlife Service is a federal agency under the DOI. DOI has delegated its responsibility for administration of the ESA to the Service.

68. Defendant Bureau of Land Management is a federal agency under the DOI. BLM is responsible for managing the Red Cliffs NCA. BLM is the agency responsible for ESA consultation with respect to the Northern Corridor Highway right-of-way and related activities. BLM manages the Federal lands in Zone 6, which constitutes approximately 50% of the Zone 6 lands.

## <u>FIRST CLAIM FOR RELIEF</u>

### <u>(Improper Imposition of the Northern Corridor Changed Circumstance in Violation of ESA Section 10 and the No Surprises Rule)</u>

69. Paragraphs 1 through 68 are realleged and incorporated as if fully set forth herein.

70. Section 10 of the ESA authorizes states, local governments, and private landowners to apply for an Incidental Take Permit for otherwise lawful activities that may harm listed species or their habitats. To obtain a permit, an applicant must submit an HCP outlining what it will do to "minimize and mitigate" the impact of the permitted take on the listed species. 16 U.S.C. § 1539(a)(2)(B).

71. To address the problem of maintaining regulatory assurances and providing regulatory certainty in exchange for conservation commitments, the Services jointly established a ''No Surprises'' policy for HCPs on August 11, 1994. The No Surprises policy set forth a clear commitment by the Service that, to the extent consistent with the requirements of the ESA and other Federal laws, the government will honor its agreements under a negotiated and approved HCP for which the permittee is in good faith implementing the HCP's terms and conditions. The

16

No Surprises policy, and subsequently promulgated No Surprises Rule, provide certainty for non-Federal property owners in ESA HCP planning areas.

72. The Service's No Surprises Rule defines "changed circumstances" as "changes in circumstances affecting a species or geographic area covered by a conservation plan or agreement that can reasonably be anticipated by plan or agreement developers and the Service and that can be planned for (e.g., the listing of new species, or a fire or other natural catastrophic event in areas prone to such events)." 50 C.F.R. § 17.3. The No Surprises Rule, then, provides that "[i]f additional conservation measures are deemed necessary to respond to changed circumstances and were provided for in the plan's operating conservation program, the permittee will implement the measures specified in the plan." 50 C.F.R. § 17.32(b)(5)(i). If, however, additional conservation measures are deemed necessary to respond to changed circumstances and such measures were not provided for in the plan's operating conservation program, the Service "will not require any conservation measures in addition to those provided for in the plan without the consent of the permittee, provided the plan is being properly implemented." 50 C.F.R. § 17.32(b)(5)(ii).

73. The Service approved the Amended HCP and Renewed ITP in January 2021.

74. In the Amended HCP, the County, working with the Service, identified eight Changed Circumstances that may occur over the Renewed ITP term and the actions the County would take to address each changed circumstance. One of the changed circumstances identified in the Amended HCP included approval of the Northern Corridor ROW. Importantly, the Northern Corridor changed circumstance only "trigger[ed] upon BLM approval of right-of-way for the Northern Corridor across Reserve Zone 3 *and USFWS issuance of a Biological Opinion that addresses incidental take of the MDT associated with the proposed Northern Corridor*." (Emphasis added.)

75. The Service issued the Northern Corridor BiOp on January 1, 2021. Pursuant to the Settlement Agreement, BLM requested withdrawal of the Northern Corridor BiOp in November 2023.

76. The Service issued the Amended BiOp on March 8, 2024. The Amended BiOp withdrew the portion of the biological opinion related to the Northern Corridor. In other words, there is no longer a biological opinion that addresses incidental take of the Mojave desert tortoise associated with the Northern Corridor.

77. The Service's withdrawal of the Northern Corridor portions in the Amended BiOp removed one of the required triggers for implementation of responsive measures described in the Northern Corridor changed circumstance. The Service determined that the County is nevertheless obligated to continue to carry out such responsive measures pursuant to the Northern Corridor changed circumstance.

78. The Service's position is in violation of ESA section 10 and the No Surprises Rule. ESA section 11 provides the County the basis to pursue this claim and this Court the ability to adjudicate this claim.

79. In light of the Service's failure to comply with the ESA, and the significant likelihood that the Service will continue to violate the ESA by insisting on the County's performance of its obligations under the Northern Corridor changed circumstance despite withdrawal of the Northern Corridor BiOp, the Service must be permanently enjoined from enforcing the conservation measures set forth in the Amended HCP under the Northern Corridor changed circumstance until such time as the Service reissues a biological opinion for the Northern Corridor and only if the Northern Corridor ROW remains in place. If the Service is not so enjoined, the County will suffer irreparable injury for which there is no adequate remedy at law.

80. Further, because an actual controversy exists between the County on the one hand and the Service on the other regarding the County's obligations under the Amended HCP in light of

62849362

the withdrawal of the Northern Corridor BiOp, the County is entitled to and hereby seeks a declaration that the Service has violated Section 10 of the ESA, the No Surprises Rule, and its implementing regulations.

## SECOND CLAIM FOR RELIEF

## (Improper Imposition of the Northern Corridor Changed Circumstance in Violation of ESA Section 10, the No Surprises Rule, and the APA)

81. Paragraphs 1 through 68 are realleged incorporated as if fully set forth herein.

82. Section 10 of the ESA authorizes states, local governments, and private landowners to apply for an Incidental Take Permit for otherwise lawful activities that may harm listed species or their habitats. To obtain a permit, an applicant must submit an HCP outlining what it will do to "minimize and mitigate" the impact of the permitted take on the listed species. 16 U.S.C. § 1539(a)(2)(B).

83. To address the problem of maintaining regulatory assurances and providing regulatory certainty in exchange for conservation commitments, the Services jointly established a ''No Surprises'' policy for HCPs on August 11, 1994. The No Surprises policy set forth a clear commitment by the Service that, to the extent consistent with the requirements of the ESA and other Federal laws, the government will honor its agreements under a negotiated and approved HCP for which the permittee is in good faith implementing the HCP's terms and conditions. The No Surprises policy, and subsequently promulgated No Surprises Rule, provide certainty for non-Federal property owners in ESA HCP planning areas.

84. The Service's No Surprises Rule defines "changed circumstances" as "changes in circumstances affecting a species or geographic area covered by a conservation plan or agreement that can reasonably be anticipated by plan or agreement developers and the Service and that can be planned for (e.g., the listing of new species, or a fire or other natural catastrophic event in areas prone to such events)." 50 C.F.R. § 17.3. The No Surprises Rule, then, provides

that "[i]f additional conservation measures are deemed necessary to respond to changed circumstances and were provided for in the plan's operating conservation program, the permittee will implement the measures specified in the plan." 50 C.F.R. § 17.32(b)(5)(i). If, however, additional conservation measures are deemed necessary to respond to changed circumstances and such measures were not provided for in the plan's operating conservation program, the Service "will not require any conservation measures in addition to those provided for in the plan without the consent of the permittee, provided the plan is being properly implemented." 50 C.F.R. § 17.32(b)(5)(ii).

85. The Service approved the Amended HCP and Renewed ITP in January 2021.

86. In the Amended HCP, the County, working with the Service, identified eight Changed Circumstances that may occur over the Renewed ITP term and the actions the County would take to address each changed circumstance. One of the changed circumstances identified in the Amended HCP included approval of the Northern Corridor ROW. Importantly, the Northern Corridor changed circumstance only "trigger[ed] upon BLM approval of right-of-way for the Northern Corridor across Reserve Zone 3 *and USFWS issuance of a Biological Opinion that addresses incidental take of the MDT associated with the proposed Northern Corridor*." (Emphasis added.)

87. The Service issued the Northern Corridor BiOp on January 1, 2021. Pursuant to the Settlement Agreement, BLM requested withdrawal of the Northern Corridor BiOp in November 2023.

88. The Service issued the Amended BiOp on March 8, 2024. The Amended BiOp withdrew the portion of the biological opinion related to the Northern Corridor. In other words, there is no longer a biological opinion that addresses incidental take of the Mojave desert tortoise associated with the Northern Corridor.

62849362

89. The Service's withdrawal of the Northern Corridor portions in the Amended BiOp removed one of the required triggers for implementation of responsive measures described in the Northern Corridor changed circumstance. The Service determined that the County is nevertheless obligated to continue to carry out such responsive measures pursuant to the Northern Corridor changed circumstance.

90. The Service's position is in violation of ESA section 10 and the No Surprises Rule, and, therefore, unlawful.

91. Issuance of the Amended BiOp is a final agency action within the meaning of the APA.

92. Because the Amended BiOp removed one of the required triggers for implementation of responsive measures described in the Northern Corridor changed circumstance and the Service determined that the County is nevertheless obligated to continue to carry out such responsive measures pursuant to the Northern Corridor changed circumstance, the Service's position is Specifically, the Service's actions are in violation of ESA section 10 and the No Surprises Rule, in violation of the APA. 5 U.S.C. § 706(2)(C), (D) (reviewing court shall hold unlawful and set aside agency action in excess of statutory jurisdiction, authority, or limitations, or without observance of procedure required by law).

## THIRD CLAIM FOR RELIEF

### (Improper Reinitiation of Consultation in Violation of 50 C.F.R. § 402.16)

93. Paragraphs 1 through 68 are realleged and incorporated as if fully set forth herein.

94. The Service and National Marine Fisheries Service have promulgated a single regulation addressing four circumstances in which reinitiation of consultation is required ("Reinitiation Triggers"): (1) Amount or extent of incidental take is exceeded; (2) New information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) Action is modified in a manner causing

62849362

effects to listed species or critical habitat that were not previously considered; and (4) New species is listed or critical habitat designated that may be affected by the action. 50 C.F.R. § 402.16.

95. The Northern Corridor BiOp lists only these four circumstances as reinitiation triggers.

96. Reinitiation requirements set forth in Section 1.F.5.h of the BLM Special Status Species Management Manual ("Manual") are identical to those identified by Service regulation. The Manual also clarifies that there is no duty to reinitiate consultation unless there is "ongoing agency action."

97. Neither the ESA nor the ESA regulations include any other basis to withdraw a validly issued biological opinion.

98. None of the Reinitiation Triggers have, in fact, occurred. The amount or extent of incidental take authorized by the Northern Corridor BiOp has not been exceeded. There is no new information revealing that the effects of the BLM's granting of the Northern Corridor ROW may affect listed species or critical habitat in a manner or to an extent not considered in the BiOp. The BLM's underlying action was not modified in a manner causing effects to listed species or critical habitat that were not considered in the BiOp. And finally, no new species have been listed or critical habitat designated that may be affected by the relevant BLM actions.

99. BLM's sole basis for its Request to Withdraw was to comply with a single provision – Section 3.c – of the Settlement Agreement.  Nothing in the Settlement Agreement states or implies that any of the Reinitiation Triggers have occurred relative to the Northern Corridor BiOp. BLM's Request to Withdraw did not indicate expressly or otherwise that one or more of the reinitiation triggers occurred.

100.    Through the Request to Withdraw, the BLM improperly sought to reinitiate consultation on grounds not authorized or contemplated in 50 C.F.R. § 402.16 or the Northern

Corridor BiOp and in a manner not contemplated in the ESA, Section 7 implementing regulations, or relevant Service or BLM guidance or policy.

101.    Because none of the Reinitiation Triggers have occurred relative to the Northern Corridor BiOp, the BLM's Request to Withdraw was improper.

102.    In response to the BLM's Request to Withdraw, the Service unlawfully agreed to reinitiate consultation on grounds not authorized or contemplated in 50 C.F.R. § 402.16 or the Northern Corridor BiOp. The Service's issuance of the Amended BiOp was unlawful. Section 11 of the ESA provides the County the basis to pursue this claim and this Court the ability to adjudicate this claim.

103.    Because an actual controversy exists between the County on the one hand and the Service and the BLM on the other regarding the validity of the Federal Defendants reinitiating consultation on the Northern Corridor BiOp, the County is entitled to and hereby seeks a declaration that the Service and the BLM has violated the ESA and its implementing regulations.

## FOURTH CLAIM FOR RELIEF

### (Improper Reinitiation of Consultation in Violation of APA)

104.    Paragraphs 1 through 68 are realleged and incorporated as if fully set forth herein.

105.    The Service and National Marine Fisheries Service have promulgated a single regulation addressing four circumstances in which reinitiation of consultation is required ("Reinitiation Triggers"): (1) Amount or extent of incidental take is exceeded; (2) New information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) Action is modified in a manner causing effects to listed species or critical habitat that were not previously considered; and (4) New species is listed or critical habitat designated that may be affected by the action. 50 C.F.R. § 402.16.

62849362

106.     The Northern Corridor BiOp lists only these four circumstances as reinitiation triggers.

107.     Reinitiation requirements set forth in Section 1.F.5.h of the BLM Special Status Species Management Manual ("Manual") are identical to those identified by Service regulation. The Manual also clarifies that there is no duty to reinitiate consultation unless there is "ongoing agency action."

108.     Neither the ESA nor the ESA regulations include any other basis to withdraw a validly issued biological opinion.

109.     None of the Reintiation Triggers have in fact occurred. The amount or extent of incidental take authorized by the Northern Corridor BiOp has not been exceeded. There is no new information revealing that the effects of the BLM's granting of the Northern Corridor ROW may affect listed species or critical habitat in a manner or to an extent not considered in the BiOp. The BLM's underlying action was not modified in a manner causing effects to listed species or critical habitat that were not considered in the BiOp. And finally, no new species have been listed or critical habitat designated that may be affected by the relevant BLM actions.

110.     BLM's sole basis for its Request to Withdraw was to comply with a single provision – Section 3.c – of the Settlement Agreement.  Nothing in the Settlement Agreement states or implies that any of the Reinitiation Triggers have occurred relative to the Northern Corridor BiOp. BLM's Request to Withdraw did not indicate expressly or otherwise that one or more of the reinitiation triggers occurred.

111.     Through the Request to Withdraw, the BLM improperly sought to reinitiate consultation on grounds not authorized or contemplated in 50 C.F.R. § 402.16 or the Northern Corridor BiOp and in a manner not contemplated in the ESA, Section 7 implementing regulations, or relevant Service or BLM guidance or policy.

112.    Because none of the Reinitiation Triggers have occurred relative to the Northern Corridor BiOp, the BLM's Request to Withdraw was improper.

113.    In response to the BLM's Request to Withdraw, the Service unlawfully agreed to reinitiate consultation on grounds not authorized or contemplated in 50 C.F.R. § 402.16 or the Northern Corridor BiOp. The Service's issuance of the Amended BiOp was unlawful.

114.    Issuance of the Amended BiOP is a final agency action within the meaning of the APA.

115.    The Service's issuance of the Amended BiOp is the result of an improper initiation of its regulations (50 C.F.R. § 402.16), in violation of the APA. 5 U.S.C. § 706(2)(C), (D) (reviewing court shall hold unlawful and set aside agency action in excess of statutory jurisdiction, authority, or limitations, or without observance of procedure required by law).

## **PRAYER FOR RELIEF**

WHEREFORE, the County respectfully requests that the Court enter judgment as follows:

1)    Declare that the Service has violated Section 10 of the ESA, the No Surprises rule, and its implementing regulations in requiring the County to comply with the Northern Corridor changed circumstance despite withdrawal of the Northern Corridor BiOp;

2)    Direct the Service to void the March 2024 Amended BiOp and reinstate the 2020 Northern Corridor BiOp;

3)    Enjoin the Service from enforcing the requirements of the Northern Corridor changed circumstance under the Amended HCP and Renewed ITP until such time as the Service reissues a biological opinion for the Northern Corridor and only if the Northern Corridor ROW remains in place;

4)    Declare that the Service and the BLM have violated the ESA by improperly reinitiating consultation for the Northern Corridor;

5)    Direct the Service to remedy its violation of the ESA within a reasonable time;

62849362

6)      Retain jurisdiction over this matter until such time as Federal Defendants have fully complied with the requirements of the ESA;

7)      Award the County the costs of litigation pursuant to the ESA, 16 U.S.C. § 1540(g)(4); and

8)      Grant the County such other further relief, including injunctive relief, as the Court may deem just and proper.


Dated:  August 6, 2024                 Respectfully submitted,


*/s/ Eric Clarke*
Eric Clarke, County Attorney
Devin Snow, Lead Civil Attorney
Washington County Attorney's Office
33 North 100 West
St. George, Utah 84770
Telephone:  435.301.7100
Eric.Clarke@wcattorney.com
Devin.Snow@wcattorney.com

Paul S. Weiland, CA Bar No. 237058
*(Pro Hac Vice Application Pending)*
David J. Miller, CA Bar No. 274936
*(Pro Hac Vice Application Pending)*
Nossaman LLP
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone:  949.833.7800
pweiland@nossaman.com
dmiller@nossaman.com

*Attorneys for Plaintiff*
*Washington County, Utah*

62849362